Hale, J.
The King Varnish Company was a corporation, organized under the laws of Ohio in January, 1883, and soon thereafter commenced and continued to carry on business in the city of Akron until January, 1889, when it made an assignment of all its assets to Albert T. Page, for the benefit of its creditors. The assets proved to be insufficient to pay the debts of the corporation.
The plaintiff, the Painesville National Bank, recovered a judgment against the corporation after the assignment had been made, and brought this action for t\yo objects and purposes. First, to enforce the payment of subscriptions to the capital stock, which it is claimed have not been paid, and are yet due to the corporation. The first proposition is to collect unpaid subscriptions. Second, to enforce the individual liability of the stockholders, under the constitution and .section 3258, Revised Statutes, for the benefit of the creditors — both claims being made in behalf of all the creditors of the corporation. The original petition filed omitted the first claim; that is, the claim against the stockholders for the non-payment of-the stock subscriptions, but it was afterward brought into the case by amendment. I need not stop to, recite how. The two claims are before this court to be adjudicated.
The first proposition made is this : That there having been an assignment by the corporation to an assignee for the benefit of the creditors, this court has no jurisdiction to enforce the payment of the unpaid subscriptions to the stock, if there be any.
It will be conceded that if no assignment had been made, the creditors could maintain this action to enforce the payment of the unpaid subscriptions to the stock; and if that cannot be done in this action, it is because of the fact that .there has been an assignment to an assignee.
It will be noticed that the same issue, in the attempt to enforce the individual liability in behalf of these answering stock *565 holders, is made as upon the other issue, and this court must determine for the purpose of determining whether an assessment shall be made against the particular stockholders answering, whether that particular person is, or is not a stockholder in the corporation; and I can readily see that it would lead to some confusion to hold that this court has no jurisdiction. Supposing that we should determine that these answering defendants who make this question, are not stockholders of the corporation, and therefore refuse to assess-them, I suspect that they would answer, when called upon in another court to answer to the assignee for unpaid subscriptions,-that that question had been settled in a case in which both were parties; I am not saying that it would be a good answer, but certain' it is that that issue must be passed upon, not upon the question of whether the unpaid subscriptions shall be paid or not-, but upon the question whether an assessment shall be made against these parties upon their individual liability; -The assignee being before the court, and consenting that this issue may be determined here, we hold that the same result would follow as if there had been no assignment; that is, that we have jurisdiction to determine that question and end the controversy, and we so hold. The assignee is a party here; he makes no objection, and, as we understand, counsel who represent him consents that that issue may be tried and determined.
The first proposition made, which is common to all defendants answering, is, that at the time of the subscription that was made by these defendants to the preferred stock of the corporation, there was no preferred stock, and no power in the corporation to issue preferred stock, and therefore, the subscription, in such form, is without.any validity, and cannot be enforced. The facts are these : The first step taken towards the issuing of preferred stock by this corporation was that the stockholders, at a meeting on the 11th of January, 1886, passed this resolution:
“ Resolved,, That in view of the statement rendered the com *566 pany by thp president, that the stockholders recommend the-board of directors to take immediate steps to increase the sale of the company’s stock in such manner as in their judgment shall seem best.”
On the 18th of Januaty, 1886, the directors passed this resolution:
“At a directors’ meeting, held January 18, 1886, D. L. King, Geo. W. Crouse, A. L. Conger, Joseph Hugill, A. T. Paige being present. On motion it was resolved to issue preferred stock to carry out the resolution of the stockholders,, passed 11th inst., and the president is requested to prepare a subscription book and solicit subscriptions to the-preferred stock to be binding upon the subscribers when forty thousand dollars is subscribed, and to report to the directors at a future meeting.”
In pursuance of that resolution the president of the company prepared a subscription book, which is as follows:
“ We hereby subscribe to the preferred stock of The King Varnish Company the number of shares written opposite our respective names, and agree to pay therefor the sum of one hundred dollars per share, in such installments as may be ordered by the.board of directors of said company, not exceeding twenty per cent, a month. The holders of said preferred stock to be entitled to a dividend of six per cent, per annum out of the net profits each year, before any dividend is paid to the holders of common stock.
Akron, January, 1886.”
This was signed, or another precisely in terms like it, by all of these defendants who.contest the validity of this subscription and their liability as stockholders.
On the 3rd day of May, this subscription having been taken, there was a meeting of the stockholders, and all present assented to the scheme that had been inaugurated for the issuing of preferred stock, and all the old stockholders, except two, were present at the meeting. Mr. Miller, as I understand, was not present, and Howell S. King. Mr. Miller *567 subsequently subscribed for fifty shares of this preferred stock, and paid for it, and acted as stockholder in the corporation. I think it may be safely .said that he assented to this arrangement. It is in testimony, also, that young King gave his assent ; and we find, without any further discussion, that all the stockholders in The King Varnish Company, who were such prior to the 3rd day of May, 1886, assented to and agreéd to this issuing of preferred stock; and the question is, “ What is the effect of such an arrangement ? ” It is claimed that preferred stock in the corporation could only be issued after the organization of the corporation in pursuance of the provisions of section 3263, Rev. Stat., and plainly, this issuing of preferred stock by The King Varnish Company was not in pursuance of that section of the statutes; it was not an increase of the capital stock of The King Varnish Company; it was a disposal of stock that already existed. No certificate of the increase, and no certificate was filed with the secretary of state which would authorize the company to issue other than common stock. But notwithstanding that, we hold that the existing stockholders of the corporation may, for the purpose of inducing others to subscribe to the unissued stock of the corporation, agree that the new subscribers shall be paid a stipulated annual dividend out of the net profits of the corporation, if profits are realized, before any dividends are paid to the stockholders then existing; and that subscriptions to the stock, obtained under such .an arrangement, are valid and binding upon the subscribers to the stock. We see no objection that can be made to an arrangement between the stockholders who fully assent to, and adopt that mode of obtaining subscriptions to the stock of the corporation in which they are interested. It seems to us, that there is no public policy involved that would forbid such an agreement, and when one signs and becomes a subscriber to the stock of a corporation, under an agreement with those that are then interested in it, that such an advantage shall be given to the subscriber of the stock, that it is an arrangement between the stockholders in *568 which they alone are interested, and which may be enforced ; so that the objection' made that this company had no power to issue preferred stock is not sustained.- ; , . .
The next question made in behalf of many of these answering defendants, if not all, is, that they were procured to sign the subscriptions to.this stock by fraud, such, as vitiated the contract that.they made by making that, subscription.
In answer to that claim, we hold, first: that the testimony fails to establish the fact that fraud-was practiced upon these defendants. Second, that-the subscriptions having been made between January and May, 1886, and nothing having been done prior to the assignment of the corporation for the benefit of creditors in January, 1889, that it is too late for these defendants to now make the claim that they were induced to subscribe for t,he stock of that corporation by fraud, as against the creditors of that corporation.
This, perhaps, deals with all questions that are common to all these defendants; and looking now to the-individual claims made by each severally, it is said in behalf of defendant Crouse, in addition to the claims already noted, that there is due to him a large amount from the corporation, that arose by his endorsing and paying the paper of the company ; and he says, that the amount thus paid by him should be applied in reduction of the claim against him, so far as it depends upon unpaid subscription to the stock. My own notion, when the question was stated upon the hearing was that such a claim was clearly equitable and just; but lam driven from the position by the authorities cited, and which we have been able to find. No case has been cited to us, in which the proposition was sustained, that a subscriber to stock may wait until the insolvency of the company is assured, and then may claim money due him from the corporation as aset-off, as against the claim in behalf of the creditors to enforce the subscription of the stock by him. The authorities seem all the other way. 'Hence, we hold against this claim this off-set cannot be made. Mr. Crouse had acted after this subscription with *569 the corporation, and we know of no legal defense, unless we are wrong about some of those already passed upon, which would excuse him from the payment, either of the unpaid subscription, or the amount due from him upon his individual liability.
Col. Conger appears upon this subscription list as a subscriber to the extent of fifty shares of stock, and there is no doubt but that he had a conversation with the president of The King Varnish Company, at the time he made that subscription, to the effect that David R, Paige would assume three thousand dollars, or thirty shares of the stock subscribed by him, and he subscribed with that assurance from Mr. King, the president of the company, that he would only be held for twenty shares; but we do not see how that can avail him as against the creditors of the corporation. He subscribed for the fifty shares. He paid for twenty of them. He subscribed under an arrangement, outside of the subscription paper, with Mr. King, which has not been carried out.
Mr. Barber subscribed for fen shares of the capital stock of this corporation; he subscribed long prior to the 3d of May, up to which time no one will claim that the corporation had completed its arragement for the issuing of preferred stock; so that it could fulfill its- agreement to issue preferred stock prior to that time. An issue is made as to whether Mr. Barber did, or did not, prior to that time, revoke his subscription to this stock. Testimony has been given tending both ways upon that proposition. We think, as á' matter of-law, if he did so revoke his subscription to the stock, he cannot now be held, because before it-became a completed contract, he might withdraw his proposition. He could not then be held, and it was not necessary to bring an action to annul a contract that never was made, on the ground that it was obtained by-fraud. It was a proposition made by Mr. Barber to take stock, and neither side was in shape to enforce the contract against the other until the 3rd of May; and the question of *570 fact is, whether he did so revoke that subscription prior to that time, and the preponderance of the testimony is decidedly in favor of the proposition that he did so revoke it —not only from his own testimony, but from circumstances connected with it. An employe from The King Varnish Company was about April 1st, employed by a corporation in which Mr. Barber was interested. Mr. Barber testifies that the condition of The King Varnish Company was called to his attention at that time, and he went straight to the office of The King Varnish Company, and there, in express and explicit terms, revoked the subscription. We think his defense must avail as to him.
Mr. Cornell makes precisely the same issue. Neither he, nor Mr. Barber had paid any portion of the subscription. Mr. Cornell was a subscriber to fifty shares of the capital stock. His executors now claim that he also revoked and repudiated the subscription that he made, prior to the third day of May. We have read with care the only testimony upon that proposition given by the executor in his behalf; that is, the former testimony of Mr. Cornell himself. There is a very marked difference between the effect of that testimony, and that given by Mr. Barber. Mr. Cornell, at the time he made subscription to this stock, stipulated that there should be an indemnity bond given him, indemnifying him against any individual liability upon that subscription. The particular indemnity was not furnished that was agreed to be given him, but a certain paper, signed by responsible parties, was. delivered to him, which he retained until the hearing of this case before the court below: and his testimony fails to show a clear, emphatic repudiation of this subscription, or such a one as we think should free him from his obligation upon that subscription. We therefore- decide that issue against the estate of Cornell.
What 1 have already said, I think, covers all the defenses or claims that can be made in behalf of Mr. Seiberling. We find nothing that should excuse Mr. Seiberling from re- *571 spending to his liability as a stockholder of that corporation. The same is true of each and all the defendants answering, except, as I have stated, Mr. Barber.
C. S. Cobbs, Geo. G. Allen and E. S. Voris, for plaintiff.
Charles Baird, W. L. Marvin and William H. Upson, for defendants.
There is one other claim made here in behalf of Mr. Raymond, who was early a stockholder, and early got out from under the load, but not quick enough to escape all liability. The question is whether he is to be held for his proportion of the debts that were contracted while he was a stockholder.
Without going into any lengthy discussion upon that proposition, I will state that the court are not all agreed as to whether he should be held to a liability for thedebts contracted while he was a stockholder, or wholly released. The presiding judge is of opinion, under the authority or discussion that is had in the 46 Ohio St. 404, that he should be released. A majority of the court, however, hold his liability to be substantially as determined by the court of common pleas, that he is liable for his proportionate share of the debts contracted while he was a stockholder in the corporation ; and the fact that that indebtedness has been carried, by various renewals from time to time, and not paid, does not relieve him from that liability.
Now I believe that that is substantially ail that is necessary for the court to indicate in order that a decree may be drawn in the case, and the decree will he in accordance with the opinion here made.